# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SHAWN G. DILLINGHAM, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 5:14-105 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION

Shawn G. Dillingham ("Dillingham") seeks review of an adverse decision on his applications for disability insurance benefits and supplemental security income available under the Social Security Act.[1] *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010);

---

[1]     Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability.  *See* 42 U.S.C. § 423(a); *see also Mathews v. Castro*, 429 U.S. 181, 186 (1976). Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line.  *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed. 2001).

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II. Background

*A.    Personal*

Dillingham, born in 1956, has a ninth grade education. During tenth grade, he and his best friend were hitchhiking at night, when his friend was struck and killed by a car. Thereafter, Dillingham quit school. (T. 380).

Dillingham was involved in a heterosexual relationship for 19 years, and, as a result, has two, now-grown, children as well as grandchildren. (T. 380).

Dillingham was 48 years old when he applied for social security benefits. During a fifteen-year period prior to filing his application, he worked for a total of 11 years at several jobs as a manual laborer, usually in factories or warehouses. (T. 58). His longest term of employment was four years as an assembly line worker. (*Id*.). He stopped working in August 2004, when his temporary job ended.[2] (T. 50).

---

[2]    Dillingham gave inconsistent accounts as to how his last job ended. On a disability form, he stated that he stopped work because it "was only a temp service-job ended." (T. 50). He reported to a social worker, however, that he was let go from his job at a warehouse as a result of falling asleep on the job. (T. 382).

*B.*     *Claims*

Dillingham claims to be disabled due to "sleep disorder/depression," commencing August 15, 2004. (T. 49-50). He filed two separate administrative actions, in each he sought supplemental security income and disability insurance benefits. The first (which gives rise to the current action) was filed on November 4, 2004.[3] The second, filed on February 3, 2009, was *granted* in part. Dillingham was awarded disability-based benefits effective December 20, 2006. (T. 447).

Dillingham's partial success did not foreclose his claim for benefits from August 15, 2004, (dated of alleged onset of disability) through December 19, 2006.

Dillingham's application was assigned to ALJ John P. Ramos to adjudicate the period from August 15, 2004, to December 19, 2006. ALJ Ramos conducted a new evidentiary hearing (the third with respect to his first application, the fourth altogether) on August 2, 2012. Dillingham, represented by counsel, testified. The record also consisted of testimony and evidence presented in prior hearings. (T. 448).

ALJ Ramos issued a decision denying Dillingham's applications for the "closed period"— *i.e.*, August 15, 2004 through December 19, 2006. (T. 447-58).

---

[3]     That application has now received three administrative evidentiary hearings, each resulting in denial of Dillingham's application. Two prior requests for judicial review resulted in remands pursuant to sentence four of 42 U.S.C. § 405(g). *See Dillingham v. Astrue*, No. 09-cv-236 (GLS/VEB), 2010 WL 3909630, at *8 (N.D.N.Y. Aug. 24, 2010), *report & recommendation adopted by*, 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010) (remanded); *Dillingham v. Astrue*, No. 06-cv-862 (LEK/RFT) (N.D.N.Y. Apr. 12, 2007) (consent order remanded).

The Appeals Council denied Dillingham's request to review. (T. 417-21). Dillingham then instituted this proceeding.

## III. Commissioner's Decision[4]

At Step 2 of sequential evaluation, ALJ Ramos found that Dillingham has severe impairments consisting of a back condition, anxiety disorder, and dysthmyic disorder. (T. 451). At Step 3, he found that none of these impairments are so severe as to be presumptively disabling under 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings").[5] (T. 453). Dillingham proffers no complaints about these initial findings.

ALJ Ramos next found that, despite severe impairments, Dillingham retains physical capacity to perform work at the medium exertional level with certain nonexertional mental limitations described in the note below.[6] (T. 453-

---

[4]        When adjudicating Dillingham's claim, ALJ Ramos utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[5]        The Commissioner has published in the Listings a series of impairments describing a variety of physical and mental conditions, indexed according to the body system affected. Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

[6]        ALJ Ramos assessed Dillingham's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant, during the period at issue, has the residual functional capacity to perform a full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c), with some mental work limitations. He could lift and/or carry 50 pounds occasionally, 25 pounds frequently, stand and/or walk about 6 hours and sit about 6 hours in an 8-hour workday, had an unlimited ability to push and/or pull with all of his extremities and had no postural, manipulative, visual, communicative or environmental limitations. Mentally, the claimant retained the ability to understand and follow
> (continued...)

54). When making this assessment, ALJ Ramos gave "minimal evidentiary weight" to opinions expressed by Dillingham's treating primary care physician regarding Dillingham's *physical* limitations and "no weight" to that physician's opinions regarding Dillingham's *mental* limitations.[7] (T. 455-56). ALJ Ramos further found that Dillingham's subjective testimony regarding the intensity, persistence and limiting effects of his symptoms was "not fully credible." (T. 455).

Given the residual functional capacity described above, ALJ Ramos found that Dillingham cannot perform his past relevant work because it exceeds his current mental residual functional capacity. (T. 456). But, at Step 5, ALJ Ramos determined Dillingham can perform alternative work, and, therefore, is not disabled. When making this finding, ALJ Ramos relied on the "framework" of Medical-Vocational Rules 203.26 and 203.19,[8] and Social Security Ruling 85-

---

[6](...continued)
simple instructions and directions, perform simple tasks with supervision and independently, maintain attention/concentration for simple tasks, regularly attend to a routine and maintain a schedule, relate to and interact with others to the extent necessary to carry out simple tasks, but had to avoid work requiring more complex interaction or joint effort to achieve work goals. He could handle reasonable levels of simple work-related stress in that he could make occasional simple decisions directly related to the completion of his tasks in a stable, unchanging work environment.

(T. 453-54).

[7]     Rather, ALJ Ramos stated that "[t]he mental limitations are based on the assessments by [forensic consultants] Dr. Barry and Dr. Harding." (T. 455-56).

[8]     The Medical Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

15.[9]  (T. 457).  He did not elicit testimony of an expert vocational witness in order to make his Step 5 determination.

## IV.  Points of Alleged Error

ALJ Ramos's credibility choices regarding medical opinions and subjective testimony, together with his reliance at Step 5 on Medical-Vocational Rules instead of expert vocational testimony give rise to this action for judicial review. Dillingham's brief proffers three points of error:

1.  The ALJ erred in evaluating the opinion of Plaintiff's treating physician, Dr. Ahmed, thereby failing to support the residual functional capacity determination by substantial evidence;

2.  The ALJ's Step 5 determination is unsupported by substantial evidence as he failed to obtain needed vocational testimony, despite the presence of significant non-exertional impairments; and

3.  The ALJ's credibility findings are unsupported by substantial evidence because the ALJ erred in analyzing the required factors when assessing Plaintiff's credibility.

(Dkt. No. 15, p. 1).  For analytical clarity and convenience, these points are analyzed and discussed in a different sequence than proffered in Dillingham's brief.

## V.  Residual Functional Capacity Issues (Points I & III)

Administrative law judges assess and articulate "residual functional capacity" before considering whether severely impaired persons can perform their prior relevant work (Step 4) or alternative available work (Step 5).  This term of art refers to what claimants can still do in work settings despite physical

---

[9]    SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985).

and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945. Thus, administrative law judges decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

When *assessing* residual functional capacity, administrative law judges must consider "all of the relevant medical and other evidence." *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner prescribes a multi-factor evaluative protocol for determining residual functional capacity.[10]

In practice, administrative law judges rely principally on medical source opinion and on subjective testimony (typically to a lesser degree) when assessing an impaired individual's ability to engage in work-related activities. The Commissioner again prescribes multi-factor protocols for evaluating forensic medical opinions and subjective testimonies.[11] ALJ Ramos's alleged failures to comply with these protocols, described in the next two sections, are at the heart of Dillingham's first and third points of error.

---

[10]     Through a formally-promulgated regulation and internal policy rulings, the Commissioner has established a detailed and elaborate analytical protocol for assessing residual functional capacity. *See* 20 C.F.R. §§ 404.1545(b), (c), 416.945(b), (c) (listing for comparative purposes various physical and mental abilities relevant for work activity on a regular and continuing basis); SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5–6 (SSA July 2, 1996) (prescribing function-by-function assessment of a claimant's physical and mental capacities).

[11]     Both protocols are identified and discussed *infra*.

*A.*     *Medical Opinion*

The Commissioner categorizes medical opinion evidence by "sources" described as "treating,"[12] "acceptable"[13] and "other."[14]  Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function.  *See* SSR 06–03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006) ("In addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources," as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function").

---

[12]     *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

[13]     "Acceptable" medical sources are licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "Acceptable medical source refers to one of the sources described in § 404.1513(a) who provides evidence about your impairments. It includes treating sources, nontreating sources, and nonexamining sources." 20 C.F.R. §§ 404.1502, 416.902. An acceptable medical source opinion or diagnosis is necessary to establish existence of a medically determinable impairment. SSR 06–03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006).

[14]     "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06–03p, 2006 WL 2329939, at *2. Evidence from these sources "is evaluated on key issues such as impairment severity and functional effects." *Id.*, at *2-3. "Other" source opinions, even when based on treatment and special knowledge of an individual, never enjoy controlling weight presumptions. *Id.; see also* SSR 96-2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *1 (SSA July 2, 1996) (explaining controlling-weight factors). Nor can "other" source opinion be relied upon to establish existence of a medically determinable impairment. SSR 06–03p, 2006 WL 2329939, at *2.

## 1. Treating Sources

A "treating physician rule" requires administrative law judges to give controlling weight to opinions of treating sources regarding the nature and severity of impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[15] But, when treating source opinions swim upstream, contradicting other substantial evidence, such as opinions of other medical experts, they can be rejected.[16] A treating physician's opinion also may be discounted when it is internally inconsistent.[17] Similarly, treating source opinion can be rejected when it lacks underlying expertise,[18] is brief, conclusory and unsupported by clinical findings,[19] or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected.[20]

---

[15] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *1-2; *see also Morgan v. Colvin*, No. 14-991-cv, ___Fed. App'x___, 2015 WL 668818, at *1 (2d Cir. Feb. 18, 2015); *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

[16] *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643-44 (2d Cir. 2007)(summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

[17] *See Micheli v. Astrue*, No. 11-4756-cv, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012).

[18] *See Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *6-7 (S.D.N.Y. July 31, 2009); *Armstrong v. Commissioner of Soc. Sec.*, No. 05-CV-1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008).

[19] *See Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Alvarado v. Barnhart*, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006).

[20] *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

When controlling weight is not afforded to treating-source opinion, or when other medical-source opinions are evaluated, administrative judges must apply certain regulatory factors to determine how much weight, if any, to give such opinions: (1) length of treatment relationship and the frequency of examination; (2) nature and extent of treatment relationship; (3) evidence that supports a treating physician's report; (4) how consistent a treating physician's opinion is with the record as a whole; (5) specialization of a physician in contrast to condition being treated; and (6) any other significant factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

## 2.    Medical Consultants

State agency medical consultants are recognized experts in evaluation of medical issues in disability claims under the Act. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Accordingly, their opinions can constitute substantial evidence. *See Russell v. Colvin*, No. 5:13–cv–1030 (MAD/CFH), 2015 WL 570828, at *12-13 (N.D.N.Y. Feb. 11, 2015) ("The opinions of consultative examiners . . . may constitute substantial evidence where, as here, it is supported by the medical evidence in the record.") (citing cases). Consultative opinions can be afforded even greater weight than treating-source opinions when there is good reason to reject treating source opinion, and substantial evidence supports them. The Commissioner instructs:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment

which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96–6p, TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW, 1996 WL 374180, at *3 (SSA July 2, 1996).[21]

B.    *Subjective Opinion*

Claimants must present medical evidence or findings that underlying impairments could reasonably be expected to produce the symptoms they allege. *See* 42 U.S.C. §§ 423(d)(5(a))1382c(a)(3)(A); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (SSA July 2, 1996).  The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom.  Testimony from claimants, therefore, is not only relevant, but desirable.  On the other hand, that testimony is subjective and may be colored by interest in obtaining a favorable outcome.  Administrative law judges are tasked with making credibility assessments, *i.e.*, deciding how much weight to give to claimants' subjective self-evaluations.  *See Aponte v. Secretary, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.").

---

[21]    *See also, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55-56 (2d Cir. 2008) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n. 5 (2d Cir. 1995).

To guide administrative law judges through this important adjudicatory function, the Commissioner has issued both implementing regulations and an internal policy ruling. SSR 96–7p directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could reasonably be expected to produce the individual's pain or other symptoms . . . .

> Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96-7, 1996 WL 374186, at *2. When evaluating intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require consideration of seven specific, *objective* factors (listed in the note below) that naturally support or impugn *subjective* testimony of disabling pain and other symptoms.[22] Finally, SSR 96-7 provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the

---

[22] An ALJ must evaluate a claimant's symptoms based on the medical evidence and other evidence, including the following factors:

   (i)    claimant's daily activities;
   (ii)   location, duration frequency, and intensity of claimant's pain or other symptoms;
   (iii)  precipitating and aggravating factors;
   (iv)  type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
   (v)   treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
   (vi)  measures claimant uses or has used to relieve pain or other symptoms; and
   (vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

## C.    *Credibility Choices*

As noted earlier, ALJ Ramos essentially rejected medical opinions of Dillingham's treating physician regarding Dillingham's impairment-related limitations, and he found Dillingham's subjective testimony "not fully credible" regarding intensity, persistence and limiting effects of his symptoms.

### 1.    Rejection of Treating Physician Opinion

Mohammed Ahmed, M.D., a primary care physician, first treated Dillingham in September, 2000, and then began to see him on a regular basis beginning in April, 2003.  In February and June, 2006, Dr. Ahmed advised Oswego County Department of Social Services ("Oswego DSS") that Dillingham had chronic pain and anxiety, plus depression.  (T. 578-79).  Dr. Ahmed opined that Dillingham needed to avoid stress and heavy lifting, but could engage in part-time work (without quantifying hours that could be worked.  (*Id.*).[23]

Dr. Ahmed also submitted a "Physical & Mental Medical Source Statement." (T. 328-33).  The statement was a check-the-box form wherein Dr. Ahmed diagnosed Dillingham with muscle pain, back pain, chronic abdominal pain, and chronic anxiety and depression.  (T. 328).  He opined that Dillingham experiences pain or other symptoms severe enough to interfere with attention and concentration "constantly." (T. 329).  He further indicated that Dillingham had "marked limitation" in his ability to deal with work stress. (*Id.*).  He opined that Dillingham had poor to no ability to complete a normal workday and

---

[23]    On February 19, 2007, Dr. Ahmed advised Oswego DSS that Dillingham was not capable of any work activity.  (T. 581).  This opinion is outside of the closed period pending before ALJ Ramos.

workweek without interruptions from psychologically based symptoms and perform at a constant pace without an unreasonable number and length of rest periods. (T. 332). On average, Dr. Ahmed anticipated that Dillingham's impairments or treatment would cause him to be absent from work "more than three times a month." (T. 333).

Dr. Ahmed's medical source statement was dated January 14, 2008, over a year after the relevant period at issue expired. When asked about the "nature, frequency and length of contact," Dr. Ahmed responded "Pt. Seen prn for past 2 years." (T. 328). He further opined that Dillingham's condition and limitations had existed and persisted since August 15, 2004, the date Dillingham claims to have become disabled. (T. 333).

When rejecting Dr. Ahmed's opinions regarding Dillingham's limitations, ALJ Ramos stated:

> . . .[C]ontrary to Dr. Ahmed's note, those [treatment] records show treatment of the claimant dating from April of 2003, not just since some time in 2006. No evidentiary weight is given his [January, 2008] assessment in regard to the period under review because the treatment notes from the period under review do not contain any mention of limitations, and because it appears Dr. Ahmed did not check the medical progress notes before completing the assessment, or he would have known that he began regular treatment of the claimant in early 2003.

(T. 455).

2.    Rejection of Subjective Testimony

Dillingham's subjective testimony before ALJ Ramos was brief. Dillingham testified that the only medical treatment he received during the period at issue was from Dr. Ahmed and Oswego County Mental Health. He had trouble keeping his Oswego appointments due to transportation issues, and

relied on Dr. Ahmed for his medications. Further, he was satisfied with getting his mental health treatment from his primary care physician.

In January 2005, Dillingham noted in a daily activities questionnaire that his conditions made him unable to "lift heavy objects, be around people, not as active as in the past, and I don't have the same energy." (T. 78). Additionally, he reported that he had "a lot of trouble sleeping at night." (*Id*.). In January 2008 (second administrative hearing), Dillingham testified that he had a constant "stabbing pain" in his back and left side, making him unable to sit for more than 10 minutes and stand for more than 15 minutes. (T. 397-98). He further stated sometimes he goes two to three days without sleep because of his sleep disorder. (T. 401). He also testified that being around people as well as stress causes him to have anxiety and/or anxiety attacks. (T. 402). In August 2012 (fourth administrative hearing), Dillingham testified that during the closed period at issue he experienced a lot of anxiety issues. (T. 434). He stated that he experienced anxiety and panic attacks, was diagnosed with "adult ADHD," was really claustrophobic, and could not be around a lot of people. (T. 434-35).

When assessing Dillingham's subjective credibility, ALJ Ramos gave "full credence" to Dillingham's statements concerning transportation obstacles to getting mental health treatment at Oswego Mental Health. ALJ Ramos further found that Dillingham's medically-determinable impairments reasonably could be expected to cause his alleged symptoms. ALJ Ramos found Dillingham's statements concerning intensity, persistence and limiting effects of his symptoms not fully credible. In that regard, ALJ Ramos stated:

> The claimant's mental health issues were not overly severe, based on the claimant's testimony that he was satisfied with receiving medication for his mental health issues from his primary care physician. The claimant's

credibility is additionally diminished by his earnings record that does not show him to have been strongly motivated to work.

(T. 455-56).

D.    *Dillingham's Challenges*

Dillingham argues that ALJ Ramos misapplied and violated the evaluative protocols described in Section V.*B, supra* when making his credibility choices. Dillingham infers that proper credibility choices would have resulted in a residual functional capacity finding that he is much more limited due to his physical and mental impairments than found by ALJ Ramos.

Regarding Dr. Ahmed's opinions, Dillingham argues that ALJ Ramos "wholly failed to evaluate whether Dr. Ahmed's opinion was consistent with the record." Dillingham points to evidence with which Dr. Ahmed's opinions are argued to be consistent, and suggests that the "law of the case doctrine" required ALJ Ramos to accept a conclusion of this court in its earlier (second) action for judicial review that Dr. Ahmed's mental limitations findings were consistent with his treatment notes and other evidence.[24]

Regarding subjective testimony, Dillingham argues that ALJ Ramos "wholly failed to evaluate Plaintiff's daily activities during the period at issue;" found that Dillingham's mental impairments were not "overly severe" in contradiction with his Step 2 finding that Dillingham has severe mental impairments; and failed to explain how Dillingham's eleven-year work history diminished his credibility.

---

[24]    *Dillingham v. Astrue*, No. 09-cv-236 (GLS/VEB), 2010 WL 3909630, at *8 (N.D.N.Y. Aug. 24, 2010), *report & recommendation adopted by*, 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010) ("Dr. Ahmed's assessment was consistent with his treatment notes, which indicated frequent and continuing complaints of anxiety and the treatment of Plaintiff's mental problems with varying doses of prescription medication.").

*E.    Discussion and Analysis*

ALJ Ramos's written decision contains boilerplate references to the Commissioner's regulations and rulings governing credibility assessments of forensic medical opinions and subjective testimony.  This indicates ALJ Ramos's awareness of and intent to apply correct principles of law.   Beyond that, however, one is hard-pressed to find indicia that he actually used these prescribed protocols.  ALJ Ramos never mentions or applies any of specific factors the Commissioner has listed for consideration when assessing credibility of medical opinion and subjective testimony.

The fact that a particular factor or evidentiary item is not mentioned, however, does not necessarily mean it was not *considered*.[25] Moreover, courts conducting judicial review in social security cases do not require perfect opinions or rigid, mechanical, formulaic applications of these administrative protocols.[26] Reviewing courts are more concerned with whether administrative decisions reflect that the entire record was considered, whether the substance of a prescribed analytical protocol was not traversed, and whether the ultimate

---

[25]     *See Durakovic v. Colvin*, No. 3:12-CV-6 (FJS), 2014 WL 1293427, at *8 (N.D.N.Y. Mar. 31, 2014) (citing *Barringer v. Commissioner of Soc. Sec.*, 358 F. Supp.2d 67, 79 (N.D.N.Y. 2005) (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) ("failure to cite specific evidence does not indicate that it was not considered."))); *accord Phelps v. Colvin*, 20 F. Supp.3d 392, 405 (W.D.N.Y. 2014).

[26]     *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) ("no such slavish recitation of each and every factor [20 C.F.R. § 404.1527(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear").

finding is supported by substantial evidence.[27]  The substantial evidence standard of review[28] is so deferential to the Commissioner's presumed expertise that courts reviewing slipshod administrative decisions have declined to adopt a *per se* rule that mere failure to formulaically follow and articulate a prescribed evaluative analysis is grounds for automatic remand.  *See Cichocki v. Astrue*, 729 F.3d at 177–78.  Given these circumstances, ALJ Ramos's credibility choices must be examined with a wider lens, not tunnel vision focused on technical adherence.

---

[27]    *See Cichocki v. Astrue*, 729 F.3d 172, 177-78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to provide a prescribed function-by-function analysis of residual functional capacity is grounds for remand); *see also Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004)(affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed"); *see generally Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) ("ALJ need not explicitly address each of the seven factors ... because the factors are examples of alternative evidence that may be useful [to the credibility inquiry], and not as a rigid, seven-step prerequisite to the ALJ's finding")(internal citations omitted); *Judelsohn v. Astrue*, No. 11-CV-388S, 2012 WL 2401587, at *6 (W.D.N.Y. June 25, 2012)("[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are 'sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.'") (internal citations omitted).

[28]    "Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.2004).  To be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299-300 (1939) (cited in Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991)).

The governing circuit court of appeals recently clarified a reviewing court's role in applying the substantial evidence standard.  In *Bonet ex rel. T.B. v. Colvin*, 532 Fed. App'x 58, 59 (2d Cir. 2013) (summary order), the court explained that "whether there is substantial evidence supporting the [claimant]'s view is not the question."  Rather, the court "must decide whether substantial evidence supports *the ALJ's decision*."  (emphasis in original).

1.    Medical Opinions

ALJ Ramos clearly considered all relevant evidence from Dr. Ahmed.  He specifically mentioned Dr. Ahmed's evaluative reports submitted to Oswego County DSS in 2006 and Dr. Ahmed's 2008 forensic medical source statement. ALJ Ramos discussed at length Dillingham's patient visits and Dr. Ahmed's treatment notes.  (T. 451, 454-55).

The reasons ALJ Ramos expressed for rejecting Dr. Ahmed's forensic opinions do not traverse the substance of the prescribed analytical protocol. While rejecting a professional medical opinion on the basis of an inadvertent scrivener error in recording the date when treatment first began borders on being patently unreasonable, it was within the purview of ALJ Ramos's wide discretion to decide that Dr. Ahmed's opinions were expressed casually, and, accordingly, were not entitled to credence.  This was within the purview of regulatory factor 6 (other significant factors).

More importantly, ALJ Ramos reviewed Dr. Ahmed's treatment relationship with Dillingham during the relevant time period (regulatory factor 2 – nature and extent of treatment relationship), and he rejected Dr. Ahmed's opinions after determining that Dr. Ahmed's treatment notes did not support the assertions in his 2008 assessment of limitations (regulatory factor 3 – supporting evidence).

Finally, substantial evidence supports ALJ Ramos's credibility choice.  Dr. Ahmed's treatment notes document Dillingham's subjective complaints, but they contain no objective diagnostic findings during the period at issue that would provide a basis for limitations opined in Dr. Ahmed's 2008 medical source statement.  With regard to Dillingham's mental residual functional capacity,

ALJ Ramos chose to rely on opinions from consulting psychologists who possess a greater degree of specialization than Dr. Ahmed, a primary care physician (regulatory factor 5 - specialization in contrast to condition). A review of the medical evidence, moreover, discloses that no other medical source opined that Dillingham's limitations were as severe during the relevant time period as stated by Dr. Ahmed (regulatory factor 4 – consistency with record as a whole).

Dillingham's primary objection to ALJ Ramos's weighting of Dr. Ahmed's forensic opinions focuses on his failure to acknowledge that Dr. Ahmed's mental-limitation findings were consistent with his treatment notes and other evidence. Dilllingham argues that ALJ Ramos was bound to make such finding under the "law of the case doctrine" because in an earlier judicial review action the court found that Dr. Ahmed's findings were consistent with his notes and other evidence.[29] Assuming that the law of the case doctrine is applicable at this stage of the proceedings (where no final decision has been reached), the court declines to apply it here. ALJ Ramos's decision was confined to a discrete period of time commencing August 15, 2004, and ending December 19, 2006. The earlier judicial review action covered a broader period of time, and there is no indication that the court focused on that narrower period when making its finding regarding consistency of treatment notes and forensic opinion.

Even if one assumes *arguendo* that ALJ Ramos's forensic opinions were consistent with his treatment notes and other evidence, there were valid and sufficient reasons, supported by substantial evidence, for rejecting Dr. Ahmed's opinions, and for relying instead on greater expertise of consulting psychologists when assessing Dillingham's mental residual functional capacity.

---

[29]     *See*, *supra*, at n.24.

ALJ Ramos did not articulate "internal inconsistency" as a basis for rejecting Dr. Ahmed's forensic opinions, but a review of the evidence suggests that he could have. In his 2008 medical source statement Dr. Ahmed opined that Dillingham's symptoms were severe enough to interfere constantly with attention and concentration, that he had marked limitation in ability to deal with work stress, and that he had poor to no ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a constant pace without an unreasonable number and length of rest periods, Dr Ahmet. (T. 332). But, in that same document, Dr. Ahmed further opined that Dillingham had a *fair* ability to deal with normal work stress, travel in unfamiliar places, and use public transportation. (*Id.*). His ability to sustain an ordinary routine without special supervision was *good*. (*Id.*). He had *unlimited* or *very good* ability to remember work like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; be aware of normal hazards and take appropriate precautions; interact appropriately with the public; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (*Id.*).

In short, ALJ Ramos did not violate the treating physician rule or otherwise commit reversible error when assessing credibility of medical opinion.

## 2. Subjective Testimony

ALJ Ramos clearly considered Dillingham's subjective testimony. He fully credited Dillingham's explanations for not regularly attending mental health treatment appointments at Oswego County Mental Health. He found that Dillingham's medically-determinable impairments reasonably could be expected to cause the symptoms Dillingham alleged. He found Dillingham's subjective opinions regarding intensity, persistence and limiting effects of his symptoms not fully credible.

The reasons ALJ Ramos expressed for not fully crediting Dillingham's subjective opinions do not traverse the substance of the prescribed analytical protocol. ALJ Ramos cited Dillingham's acknowledgment that he received satisfactory mental health treatment by a primary care physician (Dr. Ahmad) rather than mental health specialists. This fact fits within several regulatory factors prescribed for evaluating subjective testimony (intensity of symptoms, effectiveness of medication, treatment for relief and measures used to relieve symptoms). Dillingham's work history also comes within the purview of the Commissioner's regulations and ruling concerning evaluation of credibility.[30]

---

[30]    See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (SSA regulations provide that the fact-finder "will consider all of the evidence presented, including information about your prior work record." ); SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 61 Fed. Reg. 34,483, at 34,486 (1996) (Administrative law judges are specifically instructed that credibility determinations should take account of "prior work record." ); see also Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir.1998) ("[I]t bears emphasizing that work history is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony."); accord Legg v. Colvin, 574 Fed. App'x 48, 49-50 (2d Cir. 2014) (summary order).

Substantial evidence supports ALJ Ramos's articulated reasons. A reasonable mind might accept the inference that Dillingham's mental health issues were not overly severe due to lack of need for intervention by providers with specialized expertise. Similarly, a reasonable fact finder could conclude that an adult of forty-eight years of age with only an eleven-year work history out of the preceding fifteen years before disability allegedly intervened was not strongly motivated to work.

Dillingham's primary argument relates to ALJ Ramos's omission of any discussion of his daily activities when assessing his credibility. Dillingham's brief points to his testimony that he cannot lift heavy objects, does not like to be outside or around people, cannot sleep well at night, cannot be as active as he once was, and needs medication reminders.

ALJ Ramos's failure to explicitly discuss these daily activities does not constitute reversible error. First, whether this evidence supports Dillingham's view is not the question; a reviewing court must decide whether substantial evidence supports ALJ Ramos's finding. *See* note 23, *supra*. Second, the court cannot confidently conclude that it would have made a difference had ALJ Ramos expressly weighed daily activities into his discussion of Dillingham's subjective credibility. While some of Dillingham's subjective statements support his view as to intensity, persistence and limiting effects of his symptoms, others did not. In connection with his physical medical examination, Dillingham reported to Kalyani Ganesh, M.D., that during the relevant time period he cooked four to five days a week, cleaned and did laundry weekly, shopped monthly, cared for his daughter's children four to five times per week. (T. 135).

The court discerns no reversible error in ALJ Ramos's assessment of Dillingham's subjective credibility.

## VI.   Step 5 Issue (Point 2)

At Step 5 – the final step of sequential evaluation – administrative law judges determine whether there is work in the national economy claimants can do.  20 C.F.R. §§ 404.1566, 416.966.   Because claimants who have proven that they have severe impairment that preclude them from performing their past relevant work have established a *prima facie* case of disability,[31] the burden shifts to the Commissioner (at Step 5) to either award benefits or show, after considering claimants' ages, education, work experiences, and residual functional capacity, that jobs exist in significant numbers in the national economy that claimants can perform.  *See* 20 C.F.R. §§ 404.1560(c), 416.960(c); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

Generally, administrative law judges elicit or consult expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used.  In some circumstances, however, adjudicators may take administrative notice of disability *vel non* by adopting and applying findings published in the "Medical–Vocational Guidelines" commonly called "the grids."  *See Roma v. Astrue*, 468 Fed. App'x 16, 20–21 (2d Cir. 2012) (summary order); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only *exertional* impairments are in play, and an administrative law judge's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply

---

[31]    *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984).

the grids to determine whether work exists in the national economy which claimants can perform.[32]

When claimants suffer from *nonexertional* impairments[33] (solely or in addition to exertional impairments), administrative law judges may consult and utilize the grids only as a "framework" for evaluating whether nonexertional impairments result in disability.[34] Framework analysis involves (a) consulting the grids with respect to the available occupational base given a claimant's exertional capacity, age, education, work experience and transferability of skills, and (b) determining how much that individual's occupational base is further

---

[32]    *See Martin v. Astrue*, 337 Fed. App'x 87, 91 (2d Cir. 2009) (summary order); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (summary order) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[33]    A nonexertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull.  This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities." SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK THE MEDICAL VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at *6 (SSA 1983).  Examples of nonexertional limitations are as follows: nervousness, anxiety, and depression; inability to maintain attention or concentrate; difficulty understanding or remembering detailed instructions; difficulties with sight or hearing; difficulty tolerating some physical feature(s) of certain work settings, *e.g.*, inability to tolerate dust or fumes; and difficulty performing manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *See* 20 C.F.R. §§ 404.1569a(c)(1)(i)(vi), 416.969a(c)(1)(i)(vi).

[34]    *See* SSR 83-12, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, 1983 WL 31253 (SSA 1983); SSR 83-14, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING A COMBINATION OF EXERTIONAL AND NONEXERTIONAL IMPAIRMENTS, 1983 WL 31254 (SSA 1983); SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985).

eroded or diminished by nonexertional limitations and/or environmental restrictions.[35]

## A.    ALJ Ramos's Step 5 Finding

ALJ Ramos utilized a framework analysis to determine that Dillingham can make a successful adjustment to other work, and, consequently, is not disabled.  ALJ Ramos first determined that Rules 203.26 and 203.19 of the Medical-Vocational Guidelines direct a finding of "not disabled" for a person of Dillingham's age, education and work experience and who has a residual functional capacity for medium work.  He next relied on an internal social security ruling (SSR 85-15) to find that Dillingham's nonexertional mental limitations have little or no erosive effect on his occupational base of unskilled medium work.

## B.    Dillingham's Challenge

Dillingham argues that he has significant nonexertional limitations that necessitated introduction of vocational expert testimony.  Dillingham points to ALJ Ramos's residual functional capacity limitation that Dillingham avoid work requiring complex interaction with others or joint effort to achieve work goals.  He also cites deficiencies he perceives in ALJ Ramos's residual functional

---

[35]     In *Washington v. Astrue*, No. 5:12-cv-39 (GLS), 2012 WL 6044877, at *5 (N.D.N.Y. Dec. 5, 2012), a case involving a claimant with only a nonexertional impairment, this court described framework analysis as follows:

> Where the claimant suffers solely from a nonexertional impairment, the ALJ must consider: (1) the RFC reflecting such nonexertional impairment and its limiting effects on the availability of other work; and (2) the claimant's age, education, and work experience. *See* SSR 85-15, 1985 WL 56857, at *2-3 (1985). Those medical and vocational factors must be analyzed under the framework set out in the Medical-Vocational Guidelines § 204.00. *See id.* Although "[t]he assistance of a vocational resource may be helpful" and, in some cases, necessary, SSR 85-15 does not require that the ALJ always call upon the services of a VE. *Id.* at 3.

*Id.*

capacity finding due to credibility-assessment errors. He notes that with respect to Dillingham's *second* application, the administrative law judge presiding at that evidentiary hearing obtained expert vocational testimony, and Dillingham was declared disabled.

C.    *Discussion and Analysis*

Dillingham's argument that ALJ Ramos's Step 5 finding is infirm because based on an erroneous residual functional capacity assessment falls under its own weight. In Section V, *supra*, the court determined that ALJ Ramos's residual functional capacity assessment was not afflicted or irresolute because of credibility-assessment errors.

Dillingham is correct, however, when arguing that ALJ Ramos's residual functional capacity finding includes nonexertional mental impairments. Hence, further discussion is appropriate to address Dillingham's contention that ALJ Ramos erred in not eliciting expert vocational testimony on the subject of whether a person similarly situated to Dillingham can perform alternative work existing in substantial numbers in the national economy.

With respect to nonexertional mental impairments, SSR 85–15 states in part:

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SSR 85–15, 1985 WL 56857, at *4. This Ruling further contains an administrative-notice finding that the occupational base for competitive, remunerative unskilled work is severely eroded *only when a claimant has a*

*substantial loss of ability to meet any of these basic demands.  Id.* (emphasis added).

ALJ Ramos determined that during the period at issue Dillingham was able to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend to a routine; maintain a schedule; relate and interact with others to the extent necessary to carry out simple tasks, but had to avoid work requiring more complex interaction or joint effort to achieve work goals.  He also could handle reasonable levels of simple work-related stress in that he could make occasional simple decisions directly related to the completion of his tasks in a stable, unchanging work environment.  (T. 454).

These findings essentially mirror the Ruling's parameters of mental capacity for unskilled  work.  ALJ Ramos, therefore, logically concluded that the "evidence establishes that the claimant has no significant limitations in the performance of these basic mental demands of work."  (T. 457). ALJ Ramos was entitled to rely on the Ruling's administratively-noticed fact that the occupational base is not severely eroded for a person with such mental capacities.  Hence, as noted by ALJ Ramos, "the claimant's occupational bases at all levels of work are maintained such that jobs exist in significant numbers in the national economy that he could perform."  (*Id.*).

Substantial evidence supports ALJ Ramos's finding that Dillingham's nonexertional mental impairments do not significantly reduce his occupational base, and the grids provided substantial evidence supporting a Step 5 finding that Dillingham's mental impairments are not disabling.[36]

---

[36]     *Thomas v. Astrue*, Civil Action No. 13-53-E, 2014 WL 29023, at *1 (W.D. Pa. Jan. 2, 2014)("In light of the fact that Plaintiff's non-exertional limitations were merely limitations to unskilled work, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's non-exertional limitations did not significantly erode the occupational base and accordingly finds that the ALJ did not err in relying on the Social Security Rulings and the Grids in finding that Plaintiff could perform other work.").

## VII.  Disposition

For reasons expressed above, the Commissioner's decision denying disability-based benefits for the discrete period commencing August 15, 2004, and ending December 19, 2006, will be affirmed.

Signed on the ___6___ day of ____March____ 2015.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge